237 P.3d 1243 (2010)
Charles McINTOSH, Appellee,
v.
KANSAS DEPARTMENT OF REVENUE, Appellant.
No. 101,878.
Supreme Court of Kansas.
August 20, 2010.
*1245 John D. Shultz, of Kansas Department of Revenue, argued the cause, and James G. Keller, of Kansas Department of Revenue, was with him on the brief for appellant.
Michael S. Holland II, of Holland and Holland, of Russell, argued the cause and was on the brief for appellee.
The opinion of the court was delivered by JOHNSON, J.:
The Kansas Department of Revenue (KDR) administratively suspended Charles McIntosh's driving privileges based upon a refusal to submit to a breath test following his arrest for driving under the influence (DUI), see K.S.A.2009 Supp. 8-1002. McIntosh petitioned the district court to review the suspension, claiming that he had effectively rescinded his refusal and consented to take the breath test. The district court found that McIntosh had appropriately rescinded his test refusal; that he should have been permitted to take the breath test; and that the administrative driver's license suspension should be dismissed. KDR appealed the district court's decision, and the case was transferred to this court on its own motion. See K.S.A. 20-3018(c). We affirm the district court.

FACTUAL AND PROCEDURAL OVERVIEW
Officer Rod Weber of the Great Bend Police Department arrested McIntosh for DUI and transported him to the law enforcement center. Upon arrival in the receiving room, the jail staff did a pat-down search of McIntosh for weapons or contraband, after which Officer Weber proceeded to give McIntosh the implied consent advisories. When asked if he would submit to a breath test, McIntosh said no. Jail staff then escorted McIntosh to the booking area for processing, while Officer Weber remained in the receiving area for approximately 20 to 30 minutes to complete the Officer's Certification and Notice of Suspension, form DC-27, and to prepare citations. From his location in the receiving room, Officer Weber could not see McIntosh in the booking area of the jail.
When the paperwork was completed, Officer Weber went into the booking area and personally served McIntosh with the DC-27 *1246 form and the citations. At that time, McIntosh advised Officer Weber that he wanted to take the breath test, but Officer Weber would not administer it because he believed that McIntosh had been given ample opportunity to take the test earlier.
In the DC-27 form, Officer Weber certified a test refusal and, after an administrative hearing, KDR issued an order suspending McIntosh's driving privileges. McIntosh petitioned the district court for review of the administrative order, alleging that the officer's certification of a test refusal was erroneous because McIntosh had timely rescinded the refusal and consented to the test. At the district court hearing, both parties argued that the factors governing a rescission of a test refusal set forth in Standish v. Department of Revenue, 235 Kan. 900, 683 P.2d 1276 (1984), were controlling. The district court took the matter under advisement and directed the parties to submit memoranda. Ultimately, the district court issued a journal entry in which it found that "plaintiff appropriately `rescinded' his refusal pursuant to Kansas law and that he should have been allowed to take the requested breath test."

Did the district court err in determining that plaintiff effectively rescinded his refusal to submit to a breath alcohol test?

Standard of Review
"Following a trial de novo, this court reviews the trial court's license suspension to determine if it is supported by substantial competent evidence. [Citation omitted.]" Bruch v. Kansas Dept. of Revenue, 282 Kan. 764, 772, 148 P.3d 538 (2006). However, as KDR acknowledges, the parties in this case do not dispute the underlying facts. Rather, the question presented is the manner in which our prior opinion in Standish should be interpreted and applied to the undisputed facts. Accordingly, we are presented with a question of law, for which this court's review is unlimited. Cf. Bruch, 282 Kan. at 772, 148 P.3d 538 (statutory interpretation is a question of law subject to unlimited review).

Analysis
Given that KDR relies exclusively on Standish, we begin by reviewing that case. A law enforcement officer arrested Standish for DUI, advised him of his Miranda rights, and then asked him to take a breathalyzer test. Standish responded that he wanted to talk with his attorney first. The officer took Standish to the police department, where he unsuccessfully attempted to call his attorney. When Standish continued to refuse to take the breath test until he had consulted his attorney, the officer took Standish to the county jail. The officer left the jail and returned to duty. Within 15 to 30 minutes, Standish asked a jailer whether he was going to take the test. Without consulting the arresting officer, the jailer responded that it was too late. The arresting officer testified that if Standish had changed his mind while still in the officer's custody, the officer would have administered the test.
The administrative law judge found that Standish had refused to submit to a chemical breath test and suspended his driving privileges. Standish appealed to the district court, where, following an evidentiary hearing, the court found that Standish had rescinded his test refusal within a reasonable time and, therefore, the suspension order was reversed. The KDR appealed, raising "but one issue on appeal: whether an initial refusal to submit to a lawfully requested chemical test of breath to determine the alcoholic content of the blood, K.S.A. 8-1001, may be `rescinded' by subsequent consent." 235 Kan. at 900-01, 683 P.2d 1276.
The Standish opinion began by reciting that K.S.A. 8-1001 provides that all vehicle operators are deemed to have given their consent to submit to a chemical test of breath or blood to determine the alcoholic content in the operator's blood, and that a refusal to submit to such testing can result in the suspension of the operator's driver's license. The court then noted that "[t]here is nothing within the statute regarding the right of a person so arrested to change his mind and `rescind' a refusal to take the test." 235 Kan. at 902, 683 P.2d 1276. However, after advising that it had carefully considered cases from other jurisdictions, which were *1247 chain cited without further discussion or analysis, the opinion declared:
"The chemical testing system provided under our implied consent law is important because it provides the best available and most reliable method of determining whether a driver is `under the influence' of alcohol. It protects both the accused and the public. A refusal to submit to the test, on the other hand, invokes serious consequences for the person arrested. We believe that the administration of the test should be encouraged and the person arrested should be given every reasonable opportunity to submit to it. For this reason, we hold that an initial refusal may be changed or rescinded, and if rescinded in accordance with the following rules, cures the prior refusal. To be effective, the subsequent consent must be made:
(1) within a very short and reasonable time after the prior first refusal;
(2) when a test administered upon the subsequent consent would still be accurate;
(3) when testing equipment is still readily available;
(4) when honoring the request will result in no substantial inconvenience or expense to the police; and
(5) when the individual requesting the test has been in the custody of the arresting officer and under observation for the whole time since arrest." 235 Kan. at 902-03, 683 P.2d 1276.
After establishing the rules for curing an initial test refusal, the court briefly discussed how the rescission rules applied to Standish's scenario, albeit without referring to any individually enumerated rule. We take the liberty of quoting the analysis in its entirety:
"For example, if Standish had refused at the scene and then changed his mind and requested the test a few minutes later when he arrived at the police station, the test should have been given. Here, however, Standish did not change his mind until the arresting officer had taken him from the scene to the police station and then to the jail, and until some time after the officer had left the jail and returned to his other duties. This, under the rules laid down above, was too late. The arresting officer need not sit and wait for the person to change his or her mind, and thus neglect other duties." 235 Kan. at 903, 683 P.2d 1276.
In the interest of completeness, we note that the Supreme Court ultimately affirmed the district court's reversal of Standish's license suspension, notwithstanding the absence of a curative rescission. Standish found that the giving of the Miranda warnings immediately prior to requesting a breath alcohol test could have misled Standish into believing that he had the constitutional right to consult with an attorney before consenting to the test, even though no such right exists. Therefore, Standish held that the test refusal was reasonable under those unique circumstances, which circumstances are not present in the case before us. 235 Kan. at 905, 683 P.2d 1276. Here, we are only considering the validity of the curative rescission.
KDR relies exclusively on its interpretation of the Standish rules, specifically, the first and last enumerated rules. It does not challenge compliance with the middle three rules. When McIntosh asked to take the test: the results would still have been accurate; the testing equipment was still readily available; and honoring the request would not have resulted in substantial inconvenience or expense to the police. Rather, KDR contends that the test request was not made within a very short and reasonable time after the initial refusal and that McIntosh was not in the custody of the arresting officer, Officer Weber, and under his observation for the whole time between arrest and the rescinded refusal/test request.
KDR attempts to flesh out the Standish opinion to divine a specific and unique meaning in the language employed in the first and last rules. Although Lund v. Hjelle, 224 N.W.2d 552 (N.D.1974), was simply included in Standish's chain cite, without any discussion or analysis, KDR speculates that the Standish court lifted the Kansas rules for rescission from that North Dakota decision. Then, KDR argues that certain modifications to the Lund language manifest an intent by this court to make the rules more restrictive in this state.
*1248 Specifically, KDR points out that Lund said the postrefusal test request must be "made within a reasonable time after the prior first refusal." 224 N.W.2d at 557. In contrast, the Standish rule requires the subsequent consent to be "within a very short and reasonable time after the prior first refusal." (Emphasis added.) 235 Kan. at 903, 683 P.2d 1276. Likewise, Lund required that the requesting individual "has been in police custody and under observation for the whole time since his arrest." 224 N.W.2d at 557. In contrast, Standish replaced "in police custody" with "in the custody of the arresting officer." 235 Kan. at 903, 683 P.2d 1276.
The striking similarity between the language employed in Lund and that used in the Standish rules gives credence to KDR's theory that Lund was used as the examplar for our rules, notwithstanding the absence of any discussion of Lund. Likewise, the utilization of the modified language might be considered an obtuse signal that the Kansas court meant something different than the North Dakota court. Nevertheless, given that the Standish rescission rules were court-created to further the purposes of the implied consent law, it is only logical that the rules should be interpreted with a view to furthering their purposes.

Timeliness
KDR argues that the time elapse of approximately 30 minutes between McIntosh's test refusal and subsequent request to take the test was outside the "very short" time requirement in Standish's first rule. To support that contention, KDR recites the Standish analysis, quoted above, and singles out the sentence that reads: "This, under the rules laid down above, was too late." 235 Kan. at 903, 683 P.2d 1276. Then, the KDR asserts that the time period in Standish was from "fifteen to thirty minutes." 235 Kan. at 901, 683 P.2d 1276. The apparent suggestion is that if 15 to 30 minutes was too late in Standish, then 30 minutes must be untimely in this case. We note both factual and analytical problems with KDR's argument.
In reciting the facts, the Standish opinion says that the arresting officer took Standish to the jail and then the officer "left the jail and returned to duty. Within fifteen to thirty minutes Standish talked to the jailer and asked him, `Am I going to take this test or what?'" 235 Kan. at 901, 683 P.2d 1276. It is not clear whether the 15 to 30 minutes refers to the time that elapsed after the officer left the jail and returned to duty or, as KDR apparently contends, refers to the time that elapsed between the test refusal and subsequent request. Furthermore, in our case, Officer Weber's actual testimony was that it took him roughly 20 to 30 minutes to complete the paperwork after the refusal.
More importantly, the Standish analysis does not clarify whether the subsequent request was too late under the first rule, either because the elapsed time between refusal and rescission was not a very short time or was not a reasonable time, or whether the request came too late under the fourth rule because honoring the request would have resulted in substantial inconvenience for the police. The analysis emphasizes that the officer had left the jail and returned to his other duties and declares that the "arresting officer need not sit and wait for the person to change his or her mind, and thus neglect other duties." 235 Kan. at 903, 683 P.2d 1276. Given that emphasis, we do not believe that Standish intended to create a bright-line rule that 30 minutes is not a very short time, i.e., a rule that a 30-minute old refusal cannot be cured. Rather, the focus should be on the particular circumstances of a case, including a look at what is transpiring during the period of delay.
Here, unlike the officer in Standish, Officer Weber had not left the jail to return to his regular duties when McIntosh asked to take the test. In fact, Officer Weber was still performing or in the process of concluding his duties with respect to the DUI arrest. See K.S.A.2009 Supp. 8-1002(c) and (e) (officer shall personally serve notice of suspension upon person still in custody when determination of test refusal is made; if person refuses test, officer shall take any license in person's possession and issue temporary license). Moreover, as McIntosh points out, he rescinded his test refusal at the first opportunity he had to convey his wishes to *1249 Officer Weber. The elapsed time between refusal and rescission in this instance was totally under the control of the officer, who could take whatever time he wanted to complete the notice of suspension and temporary license that had to be personally served on McIntosh. There is no indication that McIntosh was intentionally manipulating the right of rescission.
The time frame here is more akin to the scenario in State v. Gray, 270 Kan. 793, 797, 18 P.3d 962 (2001). In Gray, the arresting officer gave the implied consent advisory and asked Gray to take a breath test. Gray responded that he did not have his glasses with him, that he could not understand the form, and that he wanted to speak with an attorney. The officer advised Gray that he could not consult with an attorney, but reread a portion of the implied consent notice. Gray reiterated that he wanted to speak to an attorney and opined that because he could not read the form, he should not have to take the test. "All told, the meeting between [the officer] and Gray took about 35 minutes." 270 Kan. at 795, 18 P.3d 962. The officer determined that Gray's actions constituted a test refusal and marked the DC-27 accordingly. When the form was served on Gray, he immediately said he would take the test, but the officer would not allow the test.
On appeal, this court found the facts of that case clearly met each of the Standish elements. With respect to the timeliness rule, Gray stated that "[t]he subsequent consent was given within a minute or less of when the officer checked the `refusal' box on the consent form." 270 Kan. at 797, 18 P.3d 962. Here, although we do not know exactly when Officer Weber may have checked the refusal box on the consent form, McIntosh's consent came immediately upon being served with that form, i.e., upon being notified that the refusal box had been checked. Accordingly, we find that McIntosh's rescission was timely under the Standish standards.

Custody and Observation
The fifth Standish rule requires that the person requesting the test, i.e., rescinding a prior refusal, "has been in the custody of the arresting officer and under observation for the whole time since arrest." 235 Kan. at 903, 683 P.2d 1276. KDR argued to the district court that this means that the person must be in the immediate presence of the arresting officer for the whole time from arrest until the rescission. The rationale proffered below was that an absence from the officer's presence could compromise the protocol for the test, because a defendant could claim that he or she "burped a little bit ago" or that he or she had put a hand in the mouth.
McIntosh countered that the protocol for conducting a breath test only requires an observation period of 20 minutes immediately preceding the test. A test result is not invalidated if a person "burps" or places something in his or her mouth at some point following arrest, so long as the proscribed conduct does not occur during the requisite 20-minute observation period. McIntosh suggests that the only conduct that would have invalidated the test results was a postarrest consumption of alcohol. That conduct was precluded in this case by the initial search of McIntosh for contraband and by McIntosh being in the custody of the jail personnel during the period he was not being personally observed by Officer Weber.
As noted, Standish did not favor us with an explanation of why it chose the language employed in the fifth rule. For instance, we note that the prepositional phrase, "of the arresting officer," is applied to "custody," but not to "observation," which might suggest that someone other than the arresting officer could be performing the observation requirement while the defendant is in the arresting officer's custody. Granted, the countering argument is that to be in the arresting officer's custody the defendant must be in the officer's physical presence and, thus, under the officer's observation. Of course, if that was the intent, one might ponder the necessity of including both a custody and an under-observation requirement. Nevertheless, we do not believe our decision should hinge on parsing the language used to create the court-made rule in Standish. Rather, we should be guided by the purpose behind the rule.
*1250 In developing the rescission rule, Standish opined "that the administration of the test should be encouraged and the person arrested should be given every reasonable opportunity to submit to it." 235 Kan. at 902, 683 P.2d 1276. As McIntosh argues, under KDR's interpretation of the rule, some arrested persons will be precluded from changing their minds about taking the test, even if the consent immediately follows refusal, based upon what the officer may have done after the arrest. For instance, an arresting officer might leave the arrestee in the patrol car or in the custody of another officer while searching the arrestee's vehicle for open containers. The officer might use the restroom or permit the arrestee to do so. The officer might not be certified on the testing equipment, so that custody of the arrestee is delivered to a test-qualified officer. In such instances, the arrestee would not have been under observation by the arresting officer for the whole time following arrest.
Such lapses in the arresting officer's custody and observation would not preclude the arrestee's opportunity to initially consent to a breath test. KDR argues that a consent which follows an initial test refusal is simply treated differently than an initial consent. It does not explain how that disparate treatment comports with the concept of providing arrestees with "every reasonable opportunity to submit to [blood alcohol testing]." Standish, 235 Kan. at 902, 683 P.2d 1276. To the contrary, KDR would have us provide McIntosh with but one opportunity to submit to testing.
The better argument may be that the lapse of observation in this case occurred after the test refusal and that Officer Weber could not personally attest to McIntosh's abstinence from further alcohol consumption during that period. However, upon arrival at the jail, McIntosh was personally searched for contraband, which presumably would include any alcoholic beverages. Further, he was in the custody of jail personnel for the purpose of completing the booking process. It is not unreasonable to impute to the arresting officer the jailers' observational knowledge, i.e., that McIntosh was not drinking alcohol during the booking process. Cf. State v. Bieker, 35 Kan.App.2d 427, 435, 132 P.3d 478, rev. denied 282 Kan. 792 (2006) (an officer's reasonable suspicion to detain may be based upon the collective knowledge of all officers involved). Accordingly, we find that the circumstances in this case conformed to the custody and observation requirements for a valid rescission.
In conclusion, we find that the district court did not err in finding that McIntosh's rescission of his refusal of a breath test met the Standish requirements; that McIntosh's subsequent consent to testing was valid; that the arresting officer should not have refused to allow the testing; and that KDR's suspension of McIntosh's driver's license was invalid and must be reversed.
Affirmed.
DAVIS, C.J., not participating.
MICHAEL F. POWERS, District Judge, assigned.[1]
NOTES
[1] REPORTER'S NOTE: District Judge Powers was appointed to hear case No. 101,878 vice Chief Justice Davis pursuant to the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.