NOT DESIGNATED FOR PUBLICATION

No. 115,090

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RANDAL DALE LEISTER,
*Appellant*,

v.

KANSAS DEPARTMENT OF REVENUE,
DIVISION OF MOTOR VEHICLES,
*Appellee*.

MEMORANDUM OPINION

Appeal from Saline District Court; JEROME P. HELLMER, judge. Opinion filed March 10, 2017.
Affirmed.

*Roger D. Struble*, of Blackwell & Struble, LLC, of Salina, for appellant.

*Donald J. Cooper*, of Legal Services Bureau, Kansas Department of Revenue, for appellee.

Before BUSER, P.J., ATCHESON and POWELL, JJ.

BUSER, J.: In this driver's license suspension proceeding, Randal Dale Leister appeals the district court's order affirming the administrative suspension of his driving privileges. The suspension was ordered due to Leister's refusal to submit to evidentiary blood alcohol testing after his arrest for driving under the influence of alcohol (DUI).

On appeal, Leister contends the district court erred on two grounds in upholding the Kansas Department of Revenue's (KDR) suspension of his driving privileges. First, Leister claims the arresting officer lacked reasonable grounds to believe he was operating

1

a vehicle while DUI and, as a result, the officer had no statutory authority to request evidentiary blood alcohol testing. Second, Leister asserts that he properly rescinded his initial refusal to submit to evidentiary chemical testing. After carefully considering the parties' arguments and reviewing the record on appeal, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

At about 2:42 a.m. on June 13, 2014, the Salina Police Department dispatched Officer Gabriel Walz to investigate a pickup truck that was illegally parked at a railroad crossing. Upon arrival, Officer Walz noticed there were no trains in the vicinity, the railroad crossing arms were up, the pickup truck was located in the center northbound lane of traffic with its engine running, and Leister was asleep in the driver's seat. Based on these circumstances, Officer Walz suspected that Leister might be impaired because "in the past when [he had] . . . dealt with somebody who [had] fallen asleep, whether it be at a drive-through at a restaurant or . . . railroad tracks . . . that's typically the case."

Officer Walz knocked on the driver's side window to awaken Leister. When Leister responded, the officer asked him if he had consumed any drugs or alcohol, and Leister responded in the negative. Officer Walz then asked Leister where he was going, and Leister stated he was headed home from his shop. If true, however, Leister's pickup truck was facing the wrong direction, and when Officer Walz informed Leister of this fact, he "looked around for awhile, he seemed confused, his eyes were watery, [and] he just kind of gawked looking around." The officer asked Leister to tell him what direction he was facing, and 10 or 15 seconds later, Leister was unable to do so. In this regard, Officer Walz also noted that Leister was having difficulty communicating with him because he had to repeat questions in order to get a response.

2

Although Officer Walz did not smell an odor of alcohol coming from the pickup truck, Leister's confusion concerned him, so he asked Leister to step out of the vehicle. Leister then walked to the rear of the pickup truck with no apparent difficulty.

After Leister left the vehicle, Officer Walz detected a "moderate odor of alcohol" coming from the pickup truck. Consequently, the officer asked Leister "if he was sure he hadn't been drinking and [Leister] still denied consuming any alcohol."

Officer Walz asked Leister to perform some field sobriety tests, specifically, the walk-and-turn and one-leg stand tests. According to the officer, he detected a light odor of alcohol coming from Leister's person while he was speaking with him about the field sobriety tests. Officer Walz reported that Leister failed the walk-and-turn test because he came out of his instructional stance more than once, he raised his arms for balance on his first set of nine steps, he did not use a small series of steps to turn himself around, he came off the line while attempting to turn, and during his second set of nine steps, he stopped walking, stepped off the line, and used his arms for balance. Officer Walz reported that Leister also had difficulty executing the one-leg stand test because he swayed and used his arms to balance as he held his right foot off the ground. The officer then asked Leister to submit to a preliminary breath test (PBT), but he refused.

Officer Walz placed Leister under arrest for DUI, provided him with a copy of the implied consent advisory, and read the advisory aloud to him. Leister refused to submit to an evidentiary breath test, so Officer Walz applied for a search warrant to draw Leister's blood. During this time, Leister was left alone in the holding cell. After obtaining the search warrant, Officer Walz transported Leister directly to the hospital where blood was drawn.

After the KDR suspended Leister's driving privileges due to his refusal to submit to evidentiary chemical testing following his arrest, Leister petitioned for judicial review.

3

In his petition, Leister alleged that he was entitled to relief because (1) Officer Walz lacked reasonable grounds to request chemical testing, since he did not exhibit any balance problems, was able to communicate, and did not have slurred speech, and (2) he did not refuse to take a chemical test.

The district court held a trial de novo on November 10, 2015, and during the trial Leister testified on his own behalf. According to Leister, he was "apparently asleep" when Officer Walz arrived at the railroad crossing, and he indicated that he had been "waiting on a train for about 30 minutes and [he had] been working all day since 6 o'clock in the morning and [he] was tired." Leister believed he told Officer Walz that he was headed home, and when Officer Walz then asked where he lived and for the location of his shop, he provided this information. Leister conceded that his pickup truck was facing the opposite direction from his house, but he maintained that he had "wanted to go back [to his shop] and . . . make sure [he] locked [his] doors."

According to Leister, after Officer Walz completed an HGN test, he said "you can go, you passed the test or whatever and you can go." But before Leister left, the officer asked to see his driver's license. Leister handed Officer Walz a "pink slip [DC-27 form] from [a] prior [driver's license suspension proceeding]." Leister maintained that upon receipt of the pink slip, the officer stated, "'Well, I smell alcohol now.'" Leister maintained that despite Officer Walz' assertion to the contrary, he passed all of the field sobriety tests; in fact, according to Leister, Officer Walz told him that he passed the tests.

During the trial, Leister also attempted to introduce evidence that he had rescinded his refusal to submit to evidentiary chemical testing. The KDR objected to this line of questioning, arguing that the only two issues Leister presented for judicial review involved whether reasonable grounds existed to request evidentiary chemical testing and whether Leister refused Officer Walz' request for such testing. In response, Leister

4

countered that the factual circumstances arising after his refusal would be relevant if he later recanted his refusal and voluntarily submitted to a blood test.

The KDR renewed its objection arguing that this issue ventured beyond the issue of voluntary consent because once Officer Walz applied for and obtained a search warrant, the time was passed for Leister to consent. After the district court pointed out that Leister had not raised the issue of rescission in his petition for judicial review, Leister argued that it was part and parcel of the question whether he refused Officer Walz' request for chemical testing.

The district court disagreed and sustained the KDR's objection because whether Leister recanted his initial refusal at the hospital was beyond the scope of Leister's petition for review. The district court, however, allowed Leister's counsel to make an evidentiary proffer on the issue. In response, Leister's counsel explained that he believed Officer Walz would testify that Leister had no access to alcohol while he was in the holding cell and Leister was taken from the cell directly to the hospital and placed in a room. Leister's counsel also proffered that Officer Walz would testify that he stayed in the hospital room with Leister and "a technician from the hospital authorized to draw blood came in who . . . inquired as to whether or not [Leister] was going to submit to the test and [Leister] voluntarily said, 'Yeah, I'll go ahead and take the test.'" At the KDR's suggestion, Leister's counsel was permitted to question Officer Walz on this issue, and the district court granted the request for "clarity of the record."

Officer Walz testified that a district judge notarized the search warrant for Leister's blood draw at 4:03 a.m., and he executed the return on the search warrant at 5:40 a.m. The officer explained that he served Leister with the search warrant at the hospital, and upon learning of the warrant, Leister "gave it voluntarily" and did not have to be "restrained, strapped down, [or] forcibly held in order for the lab technician to draw the blood." According to the officer, however, Leister never communicated his consent to the

5

blood test; instead, "he just silently complied with the warrant." Officer Walz explained, "As I recall, yes, he never consented other than giving his arm." The officer interpreted Leister's action of giving his arm as "[a] consent to comply with the warrant."

Upon hearing Officer Walz testimony, the district judge reaffirmed his decision to sustain the KDR's objection:

> "Okay, then the previous rulings of the Court would stand; the objection is sustained as raised by the [KDR] at this point in time.
> "And the Court then further finds based upon this proffer that this issue has not been affirmatively raised in the Petition."

Later, while Leister was testifying, his attorney supplemented the evidentiary proffer by questioning him about what happened after his test refusal. Leister maintained that Officer Walz showed him the search warrant at the police station. Once at the hospital, Leister was taken "into this little room and the nurse came in and drew blood." When asked if he said anything to the nurse prior to the blood draw, Leister replied, "[The nurse] said, 'Just, give me your right arm.' So I said, 'Okay.'"

After reviewing the evidence and entertaining the parties' arguments, the district court affirmed the order of suspension, finding that Officer Walz had reasonable grounds to request evidentiary chemical testing and Leister refused to submit to such testing. After making extensive factual findings, the district judge explained his ruling:

> "The only issue for the Court at this juncture is whether or not the officer had reasonable grounds to—after his initial contact with Mr. Leister to continue to pursue the investigation of an impaired driver and what factors the officer would have relied upon to do so.

6

"Those have been recited into the record, the watery eyes, the confusion, the non-responsiveness, the lack of direction or understanding where the driver was and his responses to the officer's questions.

"The detection of odor of alcohol in the vehicle itself and a slight odor of alcohol on the part of the driver, Mr. Leister, the failure of the occupant, Mr. Leister, to successfully complete the tests, the walk and turn, the one-leg stand, given the totality of all of those factors as indicated by the officer in his testimony and even though he indicated he could have marked more boxes on the DC form, which he did not, he has clearly testified.

"Given all the factors, the weather that evening was conducive to these circumstances, it was a 60 degree night, zero wind basically, dry conditions, no apparent rush of traffic surrounding this particular area, so it appears to be an opportunity for both parties to have a level playing field in which to have the test administered and interpreted.

"Given the totality of the record in this matter and subject to the prior decisions of the Court in sustaining the objection of the [KDR] and the proffer raised by [defense counsel] the Court finds that the determination [of the] examiner should be affirmed at this point in time."

Leister filed a timely appeal.

REASONABLE GROUNDS TO BELIEVE LEISTER WAS OPERATING
A VEHICLE WHILE UNDER THE INFLUENCE OF ALCOHOL

Leister contends the district court erred in upholding the KDR's suspension of his driving privileges because Officer Walz lacked reasonable grounds to believe he was operating a vehicle while DUI and, thus, Officer Walz had no statutory authority to request evidentiary blood alcohol testing. The KDR, however, insists that the totality of the circumstances in this case supports the district court's conclusion that a reasonably prudent officer would believe that Leister was operating a vehicle while DUI.

"Any person who operates or attempts to operate a vehicle [in Kansas] is deemed to have given consent . . . to submit to one or more tests of the person's blood, breath,

urine or other bodily substance to determine the presence of alcohol or drugs." K.S.A. 2016 Supp. 8-1001(a). A law enforcement officer shall request evidentiary blood alcohol testing if the officer has reasonable grounds to believe the person was operating a vehicle while under the influence and the officer had arrested or otherwise taken the person into custody for any offense involving DUI. K.S.A. 2016 Supp. 8-1001(b)(1)(A). Accordingly, an officer's statutory authority to request chemical testing depends upon the legality of the individual's warrantless arrest and, notably, the reasonable grounds test is strongly related to the standard for determining whether an officer had probable cause to arrest. See *State v. Johnson*, 297 Kan. 210, 222, 301 P.3d 287 (2013); *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, Syl. ¶ 3, 290 P.3d 555 (2012).

"Probable cause to arrest is the reasonable belief, drawn from the totality of information and reasonable inferences available to the arresting officer, that the defendant has committed or is committing a specific crime." *Johnson*, 297 Kan. at 222; see *Sloop*, 296 Kan. at 20-21. In other words, "'[p]robable cause exists where "the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' [Citations omitted.]" *Sloop*, 296 Kan. at 21. "'As in other totality of the circumstances tests, there is no rigid application of factors and courts should not merely count the facts or factors that support one side of the determination or the other. [Citations omitted.]'" 296 Kan. at 20.

In cases involving a driver's license suspension, we review the district court's decision to determine whether its underlying factual findings are supported by substantial competent evidence, which is sufficient to support its legal conclusions; only when there is no factual dispute do we exercise de novo review. *Swank v. Kansas Dept. of Revenue*, 294 Kan. 871, 881, 281 P.3d 135 (2012). Substantial competent evidence is evidence possessing both relevance and substance that a reasonable person could accept as being

8

adequate to support a conclusion. *State v. Jolly*, 301 Kan. 313, 325, 342 P.3d 935 (2015). When reviewing factual findings, we do not reweigh evidence or make determinations regarding witness credibility. *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011). It is the licensee's burden to prove that the agency's decision should be set aside. K.S.A. 2016 Supp. 8-1020(q).

On appeal, Leister argues that despite the district court's finding to the contrary, reasonable grounds did not exist because Officer Walz only had a "mere suspicion" of criminal activity and "[t]he record would indicate it was only after [Leister] presented a DC-27 form as a driver's license that further investigation was done." While Leister does not cite any caselaw supporting his assertion, he cites a lengthy quotation from our Supreme Court's decision in *Sloop*, which arguably suggests he is relying on the probable cause determination discussed therein.

*Sloop*, however, is clearly distinguishable. In that case, a law enforcement officer pulled Sloop over for a defective tag light, after he had followed him for 8 to 10 blocks. Although Sloop committed no traffic violations, the officer decided to follow him because he had noticed that while executing a left hand turn, Sloop was "'sitting unusually close to his steering wheel'" and he was somewhat hesitant going into this turn. 296 Kan. at 14. Sloop provided the officer his driver's license without fumbling it and the officer noted that Sloop's speech was "'impaired,'" *i.e.*, "'not as clear as it could be but [ ] not inherently slurred either.'" 296 Kan. at 14. The officer detected an odor of alcohol emanating from Sloop and his passenger, and Sloop's eyes were watery and bloodshot. When the officer asked Sloop if he had been drinking, Sloop initially replied, "'Nothing really,'" but then stated he had consumed "'like one beer at a friend's house.'" 296 Kan. 14-15. The officer subsequently ordered Sloop to exit his vehicle, and he noted that Sloop did not stumble upon existing or was unsteady on his feet.

9

Our Supreme Court determined that, under the totality of the circumstances, the officer did not have probable cause to believe Sloop was DUI:

"We also note that while [the officer] observed Sloop's behavior during the turn, he followed Sloop for 8 to 10 blocks without observing further driving concerns. Sloop's speech was not slurred, he did not fumble while producing his license, and he did not stumble when exiting his vehicle and was steady when walking to the rear. We have no way of knowing how much the results of the preliminary breath test (which were later invalidated) contributed to [the officer's] decision to arrest at the scene. But we do know that it was not until immediately after [the officer] received what he thought were valid results that he arrested Sloop. And unlike the lower courts when they determined that [the KDR] met the additional condition of 'reasonable grounds to believe' under K.S.A. 2008 Supp. 8-1001(b)(1), we do not consider the results of Sloop's field sobriety tests or other postarrest conduct in our probable cause to arrest calculus.

"In short, we conclude de novo from the undisputed facts that there was no probable cause for Sloop's arrest. [Citation omitted.] The arrest is therefore unlawful. [Citations omitted.]" 296 Kan. at 23.

In this case, on the other hand, Officer Walz made several observations of factors indicative of intoxication. In particular, Officer Walz noted the following: (1) Leister committed a traffic violation, *i.e.*, he had illegally parked his pickup truck at a railroad crossing; (2) When Officer Walz approached Leister, he was asleep at the wheel, his vehicle's engine was running, and he was stopped in the middle of a traffic lane; (3) Leister had watery eyes; (4) A light odor of alcohol was noted coming from Leister's person and a moderate odor of alcohol was detectable in his pickup truck; (5) Leister was so confused and disoriented that he was unable to tell Officer Walz which direction his pickup truck was facing or explain why he was headed north when his destination was in the opposite direction; (6) Officer Walz had to repeat questions several times in order to get a response from Leister; and (7) Leister failed two separate field sobriety tests.

Although Leister testified to a different version of events, his argument on appeal is essentially a request for this court to reweigh the evidence, resolve evidentiary conflicts, or make credibility determinations contrary to those made by the district court. But we do not undertake such analysis when reviewing factual findings made by the district court. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

As noted by a panel of this court in *McClure v. Kansas Dept. of Revenue*, No. 109,025, 2013 WL 5870119, at *4 (Kan. App. 2013) (unpublished opinion): "[I]t is not necessary that the driver exhibit every sign of possible intoxication. It is sufficient that the police officer observe enough signs of intoxication to make a reasonable police officer believe the driver was operating a vehicle while under the influence of alcohol."

Based on the totality of the circumstances in this case, we find the district court did not err when it determined that reasonable grounds existed to warrant the belief that Leister was DUI.

RESCISSION OF INITIAL TEST REFUSAL

Next, Leister contends that although he initially refused to submit to evidentiary chemical testing, he rescinded his refusal at the hospital. Our Supreme Court has recognized that a driver's initial refusal to submit to evidentiary chemical testing "may be changed or rescinded by subsequent consent." *State v. May*, 293 Kan. 858, Syl. ¶ 2, 269 P.3d 1260 (2012).

The district court declined to consider this issue at Leister's trial de novo. It found that in his petition for review Leister had raised the issue of whether there was a refusal to consent rather than whether there was a rescission of his refusal to consent. As a result, the district court found that it was without jurisdiction to consider this specific issue. Still,

11

as summarized in the Factual and Procedural Background section, the district court permitted both parties to present an evidentiary proffer regarding the issue of rescission.

K.S.A. 2016 Supp. 8-1020 and K.S.A. 2016 Supp. 8-259 govern judicial review of a driver's license suspension. Under these statutes, district courts review driver's license suspensions in a de novo trial, and the scope of such review is limited to the exclusive list of issues identified in K.S.A. 2016 Supp. 8-1020(h), which, for purposes of this appeal, includes "whether the person refused to submit to and complete a test as requested by a law enforcement officer." K.S.A. 2016 Supp. 8-1020(h)(1)(D), (p).

Judicial review of a driver's license suspension shall be in accordance with the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.* K.S.A. 2016 Supp. 8-259(a); K.S.A. 2016 Supp. 8-1020(p); *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 396, 204 P.3d 562 (2009). Therefore, such proceedings are subject to the KJRA's pleading requirements as set forth in K.S.A. 2016 Supp. 77-614(b). See *Swank*, 294 Kan. at 876.

Licensees must strictly comply with K.S.A. 2016 Supp. 77-614(b)'s "command to state reasons for relief specific enough to place the district court and the agency on notice of the issues to be raised." *Swank*, 294 Kan. at 877 (citing *Kingsley*, 288 Kan. at 407-08). "[B]ecause a 'petition for judicial review of an agency action is jurisdictional[,] . . . the failure to comply with the pleading requirements set forth in K.S.A. 77-614(b) precludes a litigant's statutorily granted right of appeal.' [Citation omitted.]" *Kingsley*, 288 Kan. at 397. If the district court lacks jurisdiction to enter an order, an appellate court does not acquire jurisdiction over the subject matter on appeal. *Swank*, 294 Kan. at 875. Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Fuller v. State*, 303 Kan. 478, 492, 363 P.3d 373 (2015).

12

Although Leister raised the issue of rescission at the administrative hearing, in his petition he alleged, in relevant part, that he was entitled to relief because he "did not refuse to take a chemical test."

Inexplicably, after presenting extensive arguments to the district court addressing whether Leister's petition for review complied with the strict pleading requirements of K.S.A. 2016 Supp. 77-614(b), on appeal, both parties fail to brief the jurisdictional issue. Instead, they argue over whether Leister, based on the proffered evidence, rescinded his initial refusal to submit to evidentiary chemical testing.

Because both parties have abandoned the jurisdictional issue on appeal, and from the undisputed facts it is clear that Leister loses his appeal on the merits, we decline to address the jurisdictional issue in order to resolve this case. See *Alvarado v. Holder*, 743 F.3d 271, 276 (1st Cir. 2014) (holding that the court "may put aside ambiguous jurisdictional questions" under a statute "when precedent clearly dictates the result on the merits"); *Starkey ex rel. A.B. v. Boulder County Social Services*, 569 F.3d 1244, 1262-63 (10th Cir. 2009) (declining to consider a jurisdictional question where the party claiming jurisdiction would clearly lose on the merits).

In determining whether a rescission was effective, courts evaluate the following factors typically referred to as the *Standish* factors:

> "To be effective, the subsequent consent must be made:
>> "(1) within a very short and reasonable time after the prior first refusal;
>> "(2) when a test administered upon the subsequent consent would still be accurate;
>> "(3) when testing equipment is still readily available;
>> "(4) when honoring the request will result in no substantial inconvenience or expense to the police; and

13

"(5) when the individual requesting the test has been in the custody of the

arresting officer and under observation for the whole time since arrest." *Standish v.

Department of Revenue*, 235 Kan. 900, 902-03, 683 P.2d 1276 (1984).

See *May*, 293 Kan. at 863.

Whether a driver rescinded his or her initial refusal to evidentiary chemical testing is ordinarily a finding of fact. See *State v. Gray*, 270 Kan. 793, 797, 18 P.3d 962 (2001) (concluding that substantial competent evidence supported district court's finding that defendant rescinded refusal). However, since the parties do not dispute the underlying material facts relevant to the rescission issue, this is a question of law that turns on how *Standish* should be interpreted and applied to the undisputed facts. See *McIntosh v. Kansas Dept. of Revenue*, 291 Kan. 41, 43, 237 P.3d 1243 (2010).

On appeal, Leister argues: "Knowing a blood draw was going to happen anyway, [Leister] changed his mind, complied and presented his arm for the nurse to complete the blood draw. He should not be punished for first refusing a test when the goal of the officer was attained with the completed test. Even if there was no lengthy verbal assent to the blood draw, his physical actions indicated assent."

The KDR counters: "Not once did [Leister] state that he would rescind his refusal, nor did he state that he would take [the] test. [Leister] ultimately acquiesced to the blood draw only because of the order from the search warrant." We are persuaded that the KDR has the better argument.

In *Ramirez v. Kansas Dept. of Revenue*, 13 Kan. App. 2d 332, 335, 770 P.2d 490, *rev. denied* 244 Kan. 738 (1989), our court observed:

"In this case, Ramirez did not request to take the breath test after his initial refusal. Ramirez did respond to the police officer's question of whether he would like to try the sobriety test again by saying, 'Well, I don't know. I'm in so much trouble right now, it doesn't make any difference, does it? I mean, with you guys?' This statement cannot be interpreted as a request to take the breath test. *Standish*, from our reading of the opinion, requires *a specific request* by the driver to take the breath test." (Emphasis added.)

Similarly, in the present case, Leister did not make a specific request to Officer Walz that he wanted to rescind his initial refusal. The mere fact that Leister did not physically resist the blood draw but simply presented his arm to the nurse so that blood could be seized in compliance with the search warrant was not a specific request to Officer Walz to rescind his initial refusal. It was acquiescence to the court order.

Under the undisputed facts of this case we hold, as a matter of law, that Leister did not make a specific request to rescind his initial refusal. That is a legally sufficient basis to reject Leister's argument without further considering or applying the *Standish* factors. Accordingly, the district court did not err in affirming the KDR's suspension of Leister's driving privileges.

Affirmed.

15